UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BENJAMIN J. ROYER,

    Plaintiff,

  v.                                            Case No. 24-CV-1616-SCD

FRANK J. BISIGNANO,
  *Commissioner of the Social Security Administration,*

    **Defendant.**

## DECISION AND ORDER

    Benjamin Royer was diagnosed with congestive heart failure when he was still in his late 20s. In the years following his diagnosis, Royer was in and out of the hospital for heart-related issues, and he experienced several acute exacerbations, including a five-day hospital stay in July 2016. Royer eventually applied for social security disability benefits, asserting that he was unable to work due to extreme fatigue and shortness of breath, among other symptoms. An administrative law judge found that Royer was disabled as of the date he applied for benefits but not by the cut-off date for disability insurance benefits.

    Royer seeks judicial review of the unfavorable portion of the ALJ's decision, arguing that the ALJ erred in evaluating the intensity, persistence, and limiting effects of his heart-related symptoms. I agree that the ALJ erred when he discounted Royer's alleged symptoms based on noncompliance with treatment and when he failed to consider how Royer's alleged fatigue impacted his ability to work prior to his date last insured. Because the ALJ's subjective-symptom evaluation lacks logical support or explanation, I will reverse the decision denying Royer disability insurance benefits and remand the matter for further proceedings.

## BACKGROUND

In 2020, Royer applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, claiming that he was unable to work due to various physical and mental impairments. *See* R. 18.[1] Royer met the insured status requirements of the Act through September 30, 2016. R. 20. Thus, to qualify for disability insurance benefits, he had to establish disability on or before that date.

### I. Vocational and Medical Background

Royer was born in Green Bay, Wisconsin, in 1982. R. 47, 562. After high school, he moved to Ohio, got married, and worked at several banks and a credit union. R. 56–58, 562–63. He got divorced in 2006, moved back to Wisconsin, and obtained bachelor's degrees in political science and public administration. R. 47, 562–63, 979–80. After leaving Ohio, Royer worked as a mutual fund advisor for an investment management company. R. 55–56, 341, 366. However, that job lasted only a couple months because he started experiencing health problems.

Royer's heart issues first cropped up in 2008. *See* R. 816, 1339, 3981. He went to the ER, saw a cardiologist, and was diagnosed with cardiomyopathy, heart failure, and blood clots. The following year, Royer experienced decompensated heart failure. R. 1336. He was diagnosed with dilated non-ischemic familial cardiomyopathy[2] with left ventricular

---

[1] The transcript is filed on the docket at ECF No. 12-1 to ECF No. 12-11.

[2] Dilated cardiomyopathy is "a chronic disease in which 'the walls of the heart chambers stretch (dilate) to hold a greater volume of blood than normal.'" *Snead v. Barnhart*, 360 F.3d 834, 837 (8th Cir. 2004) (quoting 2 Jacqueline L. Longe, The Gale Encyclopedia of Medicine 896 (2d ed. 2002)). Non-ischemic "means that the cardiomyopathy was not caused by blockage of blood vessels." *Prange v. Astrue*, 547 F. Supp. 2d 926, 928 n.2 (S.D. Ill. 2008).

noncompaction and left ventricular ejection fraction of only 10–15%.[3] Royer had an implantable cardioverter defibrillator placed in his chest in October 2009. R. 774, 937. He experienced decompensated heart failure again in 2012, and he was in and out of the ER for similar symptoms throughout 2013. R. 1336, 1350. However, as of March 2013, his ejection fraction had improved to 35%. R. 1338.

Royer's heart issues remained stable until 2015. *See* R. 1336. In February that year, he spent a night in the hospital after presenting with a resting heart rate of 140 beats per minute. R. 1336–50. Royer also reported feeling increasingly fatigued for the past month. Treatment notes indicate that Royer had been compliant with all his medications. R. 1336, 1350–51. However, when Royer followed up with his cardiologist a week later, he was not compliant with the medication regimen prescribed at the time of discharge. R. 1329–32. Royer continued to report feeling fatigued and exhausted throughout 2015 despite medication compliance. *See* R. 1308–28. He was assessed with Class II heart failure. *See* R. 1327, 1332, 1339.

Royer was in and out of the ER again near the end of 2015. On November 28, he presented complaining of shortness of breath, dizziness, lightheadedness, and a cough. R. 1298–1302. Treatment notes indicate that Royer's Xanax medication had been adjusted a few days prior, and he claimed to be compliant with his medications. The attending physician however, suspected that Royer was not taking his medications accurately, as his digoxin level was low. Royer returned to the ER just two days later after fainting at work following a

---

[3] Ejection fraction "is a measure of the left ventricle's ability to pump blood." *Robinson v. Berryhill*, 426 F. Supp. 3d 411, 421 n.5 (E.D. Mich. 2019) (citing *Diamond v. Comm'r of Soc. Sec.*, 154 Fed. App'x 478, 480 (6th Cir. 2005)). "A 'normal' ejection fraction is greater than 55%. By contrast, an ejection fraction between 30% and 40% indicates moderate systolic dysfunction and an ejection fraction below 30% demonstrates severe systolic dysfunction." *Mejia v. Astrue*, 719 F. Supp. 2d 328, 340 n.22 (S.D.N.Y 2010) (citing American Medical Association, Guides to the Evaluation of Permanent Impairment at 170). "[A]n ejection fraction of below 30%, when accompanied by other symptoms, qualifies as a presumptive disability under the Act." *Diamond*, 154 F. App'x at 480 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02B).

coughing attack. R. 1293–97. Royer was in the ER several more times in December for fainting and shortness of breath, an accidental overdose on Xanax, and lightheadedness with ambulation. *See* R. 1277–93. During those visits, Royer claimed to be taking his other medications as directed. Treatment notes from December 21 indicate that Royer's last ejection fraction was 30–35% and that he was on the heart transplant list. R. 1277.

Royer continued to go to the ER for heart-related issues in 2016. In March, he presented complaining about intermittent palpitations and nausea. R. 1269–74. A nurse attempted to check on Royer a few days later, but he didn't answer his phone, and she couldn't leave a message. R. 1268–69. Royer was back in the ER in April for a racing heart and nausea. R. 1264–68. The attending physician suspected that Royer's symptoms resulted from him not being able to keep his medications down, as he reported frequent vomiting for the last six days. Royer returned to the ER in May complaining of shortness of breath. R. 1260–63. However, he admitted to not taking his heart medication. Treatment notes also indicate that Royer had not been reliable about following up with his heart failure team. Despite being reminded about the importance of following up with his providers, R. 1263, Royer no-showed two appointments during the spring, R. 1260. On July 1, Royer was prescribed pain meds and prednisone after going to the ER for ankle pain. R. 1256–59.

A few weeks later, Royer was hospitalized for an exacerbation of his congestive heart failure. *See* R. 1226–56. He presented to the ER on July 11 complaining about worsening shortness of breath, weight gain, abdominal bloating, and difficulty breathing. Royer insisted that he had been compliant with his medications since the May 2016 ER visit. An echocardiogram revealed severely decreased left ventricular systolic function with an ejection fraction of just 15–20%. The attending physician suspected that Royer's symptoms likely

4

precipitated by fluid retention from prednisone, dietary indiscretion, increased fluid intake following a gout attack, and medication noncompliance. Royer was discharged on July 16.

Royer continued to seek treatment for his heart condition in the months following his hospitalization. On July 18, his cardiologist assessed Class III heart failure—a more serious assessment. R. 1219–23. Royer went to the ER a few days later for dizziness and lightheadedness. R. 1213–17. He returned on July 28 with shortness of breath, weight gain, lightheadedness, and chest pain. R. 1186–98. He spent the night in the hospital and was released the following day. Treatment notes repeatedly indicate concern for medication noncompliance. However, Royer insisted throughout the remainder 2016 that he was taking his heart medications as directed. *See* R. 1167–71, 1179–84, 1205–06, 1219–23. He nevertheless reported ongoing fatigue despite medication compliance and shortness of breath after walking just two blocks, but not at rest.

Royer's health deteriorated somewhat after September 30, 2016—his date last insured. In December 2016, he told his cardiologist that chronic fatigue prevented him from holding down a steady job. R. 1135–39. An echocardiogram revealed severely decreased systolic function with an ejection fraction of just 21%. Royer's ejection fraction remained at 21% in June 2018. R. 969. The following month, Royer was admitted to the hospital after reporting increasing daily fatigue despite compliance with medications. R. 965–78. His ejection fraction increased to 32% in March 2019, but the following month it was down to 27%. *See* R. 823, 854, 861, 913, 918, 934. In August 2019, Royer spent several days in the hospital for acute decompensated heart failure. R. 821–67. His ejection fraction at the time had decreased to 22% despite reported treatment compliance. Royer had another heart failure exacerbation in January 2020. *See* R. 737–48, 14573–14697. But a July 2020 echocardiogram revealed only

5

moderate left ventricular systolic dysfunction with an ejection fraction of 36–40%. R. 726–27. Royer was removed from the transplant list. *See* R. 693–94. However, as his heart condition improved, his gout got worse and his back gave out. *See* R. 29–30, 6324–25, 6389–90, 6431–32. Royer was diagnosed with lumbar radiculopathy in July 2022. *See* R. 7133–42.

## II. Procedural Background

Royer applied for disability benefits in March 2020. *See* R. 18, 321–29. He alleged that he became disabled on December 1, 2015 (when he was thirty-three years old) due to Stage C heart failure, non-ischemic dilated cardiomyopathy, ventricular tachycardia, systolic dysfunction, hypokalemia, gout, chronic pain, fatigue, anxiety, and attention-deficit/hyperactivity disorder. *See* R. 379–94. In his application materials, Royer claimed that he was unable to work due to worsening heart failure and side effects from his medications. *See* R. 407–16. He reported experiencing extreme fatigue that affected his ability to perform daily activities and shortness of breath even while sitting.

The state agency charged with reviewing disability applications on behalf of the Social Security Administration denied Royer's applications initially and upon Royer's request for reconsideration. *See* R. 83–178. William Fowler, a consulting state-agency physician, reviewed the available medical records and determined that Royer had severe but not disabling heart issues. R. 83–119. Dr. Fowler believed that Royer could perform light exertional activity during the period of his DIB claim (December 1, 2015, through September 30, 2016) but could perform only sedentary exertional activity as of his SSI filing date (March 2, 2020). James Greco, the reviewing physician at the reconsideration level, largely agreed with Dr. Fowler's findings. *See* R. 122–76.

6

After the state-agency denial, Royer had a hearing with an ALJ in February 2024. *See* R. 45–82. Royer, who was represented by an attorney at the time, testified at the hearing. *See* R. 47–73. He told the ALJ that he last worked in 2018 as a contract worker in IT security; however, he was fired after only one month due to attendance and health issues. R. 52–53. Royer said he previously worked in a call center for an insurance company, as an advisor for an investment management company, as an assistant manager for a credit union, and in a call center for two different banks. R. 53–58. When asked about his impairments, Royer indicated that his heart issues made him very weak and very fatigued. R. 63–66. He said he had trouble walking more than a block or two, he wasn't comfortable driving (so he rarely left the house), he struggled staying awake during the day, and he used a cane or a walker to ambulate.

A vocational expert also testified at the hearing. *See* R. 74–81. The vocational expert classified Royer's past jobs as that of a complaint clerk, a stock transfer clerk, and an administrative assistant. R. 76–77. According to the vocational expert, a hypothetical person with Royer's age and vocational profile could still perform those jobs if he were limited to a restricted range of sedentary work. R. 77–78. The vocational expert said that person could also perform other jobs within the national economy, including as an assembler, a visual inspector, and a sorter. R. 78. The vocational expert indicated that employers typically tolerate employees to be off task no more than ten percent of the workday and to be absent (unexcused) no more than ten days over a twelve-month period. R. 78. However, according to the vocational expert, routine monthly absences would not be permitted. R. 78–79.

In May 2024, the ALJ issued a partially favorable decision, finding Royer disabled as of his SSI application date but not by his date last insured. *See* R. 15–44. Royer challenges only the denial of his DIB claim. *See* Pl.'s Br., ECF No. 20. The ALJ considered that

application under 20 C.F.R. §§ 404.1520, which sets forth a five-step process for evaluating DIB claims. *See* R. 18–35. Relevant here, the ALJ determined at steps two and three of that process that Royer's heart failure and obesity impairments significantly limited his ability to perform basic work activities from December 2015 through September 2016 but were not presumptively disabling. R. 21–24. The ALJ concluded that Royer's "ejection fraction readings below 30% were during a period of noncompliance with treatment, improved significantly with compliance, and did not very seriously limit the ability to independently initiate, sustain, or complete activities of daily living." R. 23 (internal quotation marks omitted). According to the ALJ, Royer's "ejection fraction eventually improved to 36% to 40% with better treatment compliance." R. 23.

Between steps three and four, the ALJ assessed Royer's residual functional capacity—that is, the most he could do despite his physical and mental limitations, *see* 20 C.F.R. § 404.1545(a). The ALJ determined that, through the date last insured, Royer had the RFC to perform sedentary work with limitations climbing, stooping, kneeling, crouching, crawling, and working around hazards and pulmonary irritants. R. 24. In assessing that RFC, the ALJ considered Royer's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 24–32.

The ALJ determined that Royer's statements concerning the intensity, persistence, and limiting effects of his symptoms were inconsistent with the overall record. The ALJ first summarized Royer's allegations, observing that he claimed he was unable to work based primarily on heart issues that caused extreme fatigue and shortness of breath even while sitting. R. 25 (citing Exhibits 2E; 4E; 5E; 7E; 14E). However, the ALJ noted that those allegations were made well past the date last insured. (Royer submitted all his disability

8

reports and function reports in September 2020 and later.) The ALJ also observed that Royer alleged at the administrative hearing that his cardiac condition resulted in weakness and fatigue, he was unable to walk more than one or two blocks, and he used a cane to ambulate. R. 25–26. According to the ALJ, Royer's alleged statements were inconsistent because, prior to the date last insured, the record did not document significant use of an ambulatory device, Royer engaged in some significant work activity, and Royer's exam findings were "generally relatively unremarkable . . . despite his poor compliance with treatment." R. 26.

The ALJ also discussed the objective medical evidence. *See* R. 26–30. The ALJ noted that, prior to his alleged onset of disability, Royer suffered from decompensated heart failure with multiple hospital admissions and the implantation of a cardioverter defibrillator. R. 26. The ALJ further noted that, after the alleged onset date of December 1, 2015, Royer went to the ER several times for heart-related issues. R. 26–27. However, the ALJ observed that, during one such visit in May 2016, Royer admitted to not being compliant with medications and not reliably following up with his heart failure team. R. 27 (citing Exhibit 3F/491). The ALJ noted that Royer was hospitalized for several days in July 2016 with an exacerbation of congestive heart failure and that Royer's ejection fraction at the time of admission was only 15% to 20%. R. 27 (citing Exhibit 3F/484, 486). But according to the ALJ, Royer had not been compliant with his medications or follow up since 2015. R. 27 (citing Exhibit 3F/461). The ALJ mentioned other treatment notes documenting "a long history of non-adherence to medical recommendations." *See, e.g.*, R. 27 (citing Exhibit 3F/441).

According to the ALJ, the record evidence prior to the date last insured did not support any further restrictions in the RFC assessment. *See* R. 28. The ALJ concluded that, while the record confirmed a history of heart failure, Royer's low ejection fraction readings correlated

9

with a period of poor compliance with medications and follow up. The ALJ also reiterated that physical exam findings during that period were "generally relatively unremarkable, . . . with a report of no shortness of breath at rest, though [Royer] had shortness of breath after walking two blocks." R. 28.

The ALJ also discussed the objective medical evidence from after the date last insured. *See* R. 28–30. According to the ALJ, the record revealed some deterioration in Royer's medical condition during that period. The ALJ noted that Royer reported increasing fatigue in May 2018, went to the ER in January 2020 for severe fatigue, and complained about fatigue and shortness of breath to his cardiac team in July 2020. R. 28–29 (citing Exhibits 37F/404, 659; 39F/337; 2F/27). However, the ALJ noted that Royer's ejection fraction at the July visit had improved to 36% to 40% and that Royer was no longer a candidate for a heart transplant. R. 29 (citing Exhibit 2F/11, 44). The ALJ nevertheless concluded that, because the record documented more frequent gout, fatigue, back and knee pain, and numbness and weakness in the extremities after March 2020, Royer required additional restrictions during that period, including being off task more than ten percent of the workday and missing work more than ten days in a twelve-month period. R. 30.

Finally, the ALJ considered the medical opinion evidence. *See* R. 30–32. The ALJ noted that all the medical opinions in the record were made after the date last insured and, therefore, were "of no significant relevance to the period through that date." R. 30. The ALJ also discussed the prior administrative medical findings of the state-agency reviewing consultants, who offered opinions about Royer's functioning during the period from his alleged onset date through his date last insured and during the period since Royer applied for SSI benefits. R. 32 (citing Exhibits 1A; 2A; 5A; 6A). According to the ALJ, those findings

were only partially persuasive, as they were generally supported by the evidence in the record at the time they were made, but they were not entirely consistent with the updated record.

The ALJ then continued with the sequential evaluation process. *See* 32–35. Relying on the vocational expert's testimony, the ALJ determined at step four that, through the date last insured, Royer could perform his past relevant work as a complaint clerk, a stock transfer clerk, and an administrative assistant. R. 32–33. The ALJ alternatively determined at step five that, through the date last insured, there were jobs that existed in significant numbers in the national economy that Royer could still perform. *See* R. 33–34. Based on those findings, the ALJ determined that Royer was not disabled at any time through his date last insured (September 30, 2016). R. 35.

The Social Security Administration's Appeals Council denied Royer's request for review, R. 3–8, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

Royer filed this action in December 2024 seeking judicial review of the Commissioner's decision denying his claim for DIB under the Social Security Act, 42 U.S.C. § 405(g). *See* Compl., ECF No. 1. The matter was reassigned to this court after all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7 & 8. Royer filed a brief in support of his DIB claim, *see* ECF No. 20; the commissioner of the Social Security Administration filed a brief in support of the ALJ's decision, *see* ECF No. 25; and Royer filed a reply brief, *see* ECF No. 28.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Royer seeks remand for rehearing, arguing that the ALJ erred in evaluating his heart-related symptoms. *See* Pl.'s Br., at 9–15.

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Policy Interpretation Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016) (citing 20 C.F.R. §§ 404.1529, 416.929). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms . . . and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. At the second step, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10. When reviewing evidence other than objective medical evidence, the ALJ may consider several factors, including the claimant's daily activities, the effectiveness of the claimant's medications, and treatment the claimant has received. *Id.* at *18–19; *see also* § 404.1529(c)(3).

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* (citing *Murphy*, 759 F.3d at 816). "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner,

13

logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

During the relevant period, Royer often complained to providers about and sought treatment for heart-related symptoms like fatigue, shortness of breath, lightheadedness, dizziness, and palpitations. *See, e.g.*, R. 1167–71, 1180–84, 1186–1208, 1213–56, 1260–74, 1277–80, 1289–1302, 1308–19, 1324–28, 1336–52. Also during the relevant period, Royer's heart failure classification was downgraded to Class III, *see* R. 1181, 1221, which "is indicative of 'marked limitation in physical activity,' such that 'less than ordinary activity causes fatigue, palpitation, or dyspnea,'" *Childress v. Colvin*, 845 F.3d 789, 793 (7th Cir. 2017) (quoting American Heart Association, Classes and Stages of Heart Failure, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure). Despite that evidence, the ALJ found Royer capable of sedentary work with postural and environmental limitations. R. 24. The ALJ declined to assess further limitations because Royer had poor compliance with medication and follow-up treatment, Royer's physical exam findings were "generally relatively unremarkable," Royer did not report shortness of breath at rest, and Royer engaged in some work activity during that time. *See* R. 24–28. According to the ALJ, Royer's low ejection fraction readings resulted from his poor compliance, and the readings "improved significantly with compliance." R. 23, 28, 32.

Royer challenges two aspects of the ALJ's subjective-symptom evaluation. First, Royer says the ALJ erred in discounting his allegations based on the belief that his reduced heart functioning corresponded with periods of medication noncompliance. Second, Royer says the ALJ failed to consider the impact fatigue had on his ability to perform sustained work activity prior to his date last insured.

14

The ALJ's subjective-symptom evaluation lacks support and explanation. It is undisputed that Royer experienced decompensated heart failure in July 2016, when he was hospitalized for several days with fatigue and shortness of breath and had an ejection fraction reading between 15% and 20%. *See* R. 1226–56. The ALJ attributed the exacerbation to lack of compliance with medication, believing that Royer had been noncompliant since 2015. R. 27 (citing Exhibit 3F/461). What the ER treatment notes actually show is that, while Royer admitted to noncompliance in May 2016, he insisted that he had been taking his medications since then:

> Patient seen in ED for similar symptoms on 05/21/16, about two months ago. Patient at the time did admit he has been noncompliant with his medications. Further, he has not been reliable about following up with his heart failure team. Patient denies such behavior currently.

R. 1227; *see also* R. 1227 ("Patient endorses taking his daily medications and denies symptom relief."); R. 1230 ("[H]e is compliant with his medications. He states he has noticed palpitations anytime he takes his digoxin but he continues to take it"); R. 1237 ("The patient states compliance with his medications."). Thus, the ALJ misstated the record when he suggested that Royer was noncompliant with medication and treatment at the time of the July 2016 heart failure exacerbation.

The ALJ also ignored evidence contrary to his medication-noncompliance conclusion. Providers suggested that the July 2016 decompensation was triggered by fluid retention from recently prescribed prednisone. *See* R. 1208 ("He has had several admissions for [heart failure] over the past 3 years, including one earlier this month for acute decompensated HF likely triggered by steroids prescribed for acute gout flare."); R. 1237 ("Admitted yesterday with fluid overload most likely secondary to recent treatment with prednisone and NSAIDs for a severe gout attack."). The ALJ, however, apparently did not consider other possible causes of the

15

low ejection fraction reading and uncritically assumed—without any supporting evidence or medical opinion—that it was caused by medication noncompliance. The ALJ also completely ignored other times during the relevant period when Royer endorsed compliance with his heart medications. *See, e.g.*, R. 1277 (December 2015: denying recently missing medications); R. 1269 (March 2016: reporting currently taking digoxin); R. 1264 (April 2016: reporting currently taking Toprol-XL); R. 1206 (July 2016: endorsing medication compliance); R. 1180–81 (August 2016: reporting full compliance with medication regimen; no compliance issues identified); R. 1168 (September 2016: reporting compliance). The ALJ did not need to blindly accept Royer's self-reports, and it appears some providers remained skeptical, *see, e.g.*, R. 1205–08 (Royer's cardiologist noting that "[c]ompliance is in question," even though Royer endorsed compliance at that visit). But the ALJ did need to explain *why* he didn't believe Royer then, especially given Royer's candidness about noncompliance at other times. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004))).

The record also does not support the ALJ's finding that the ejection fraction readings significantly improved with better treatment compliance. The ALJ cited only one example, when Royer's ejection fraction improved to between 36% and 40% in July 2020—that is, well after the date last insured and during a time the ALJ found Royer to be disabled. R. 23, 29 (citing Exhibit 2F/44). But those treatment notes are silent on whether Royer was taking his medications as prescribed. *See* R. 703–31. If anything, the medical records around that time appear to show that the improvement correlated with a switch in Royer's medication, not

16

general compliance. *See* R. 767 (Royer starting Entresto in October 2019); *see also* R. 692–702, 816–19. Moreover, the overall record does not appear to show any correlation between ejection fraction readings and medication compliance:

| Date | Ejection Fraction Reading | Reported Compliance |
| --- | --- | --- |
| February 19, 2015 | 36% | Yes |
| July 11, 2016 | 15–20% | Yes |
| December 12, 2016 | 21% | No |
| June 12, 2018 | 21% | Yes |
| March 5, 2019 | 32% | Not reported |
| April 19, 2019 | 27% | Not reported |
| August 7, 2019 | 22% | Yes |

*See* R. 694–98, 726, 763–64, 823–24, 839, 854, 861, 864, 903–37, 941, 967, 1003, 1136, 1227, 1336, 1340, 1350. Again, while the ALJ was not required to accept Royer's reports, he needed to cite record evidence that supported his disbelief and to confront the evidence contrary to his medical conclusions.

Finally, the ALJ failed to consider how Royer's alleged fatigue impacted his ability to work prior to his date last insured. The ALJ cited worsening fatigue as one factor that supported work-preclusive limitations as of the SSI filing date. *See* R. 24–25, 28–30. However, the ALJ did not mention that Royer also alleged fatigue during the relevant period. Royer often complained about fatigue to providers, saying he got short of breath after walking just two blocks. *See, e.g.*, R. 1168, 1180–82, 1205–06, 1221, 1248. Based on those reports, as well as the diagnostic evidence, Royer's heart failure team assessed Class III heart failure, R. 1223, a defining feature of which is fatigue with less than ordinary physical activity, *Childress*, 845

17

F.3d at 793. The Commissioner accurately notes that the ALJ did not need to discuss every piece of evidence mentioning fatigue. But the ALJ could not wholly ignore that alleged symptom during the relevant period; he needed to explain either why he discredited Royer's allegations or how he accounted for Royer's alleged fatigue in his RFC assessment.

In sum, the ALJ erred when he discounted Royer's alleged heart-related symptoms based on noncompliance with treatment and failed to consider Royer's alleged fatigue during the relevant period. Those errors are substantive errors of logic, not—as the Commissioner suggests—mere articulation errors. The ALJ misstated the record, ignored evidence contrary to his conclusions, and failed to consider one of Royer's main symptoms.

Those errors do not appear to be harmless. It's true that the ALJ cited reasons for his adverse symptom finding aside from Royer's alleged noncompliance with treatment, including "generally relatively unremarkable physical exam findings" and Royer's work activity during the relevant period. *See* R. 26, 28, 32. But the ALJ emphasized noncompliance throughout the decision, suggesting that factor played a prominent role in his analysis. Moreover, the ALJ did not explain *how* any of the exam findings were inconsistent with Royer's alleged fatigue, and he failed to acknowledge that Royer's attempt to work in 2016 was short-lived due to health reasons, *see* R. 342–43, 355, 372–73, 399, 405, 1136. If credited, Royer's alleged heart-related symptoms prior to his date last insured could lead to work-preclusive limitations, as the vocational expert testified that employees can be off task no more than ten percent of the workday and can miss no more than ten days of work over a twelve-month period. R. 78–79.

## CONCLUSION

Because the ALJ's subjective-symptom evaluation lacks logical support and explanation, substantial evidence does not support the RFC the ALJ assessed for the period prior to Royer's date last insured. Substantial evidence therefore does not support the ALJ's step-four and step-five findings regarding Royer's DIB claim. Accordingly, for all the foregoing reasons, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 3rd day of February, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge